[No. H032765. Sixth Dist. Oct. 27, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDRE L. HOCHSTRASER, Defendant and Appellant.

884

**886**

**COUNSEL**

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McADAMS, J.**—A jury convicted defendant of first degree murder. (Pen. Code, § 187, subd. (a).)[1] Defendant's sole contention on appeal is that the trial court erroneously denied his pretrial motion to suppress evidence, including the victim's dismembered body parts, discovered as a result of the warrantless searches of his residence and his mother's car. We will affirm.

## STATEMENT OF THE CASE

On June 2, 2006, an information was filed in Santa Clara County charging defendant with the murder of Dolores Gonzales. Defendant pleaded not guilty and filed an amended motion to suppress all evidence seized from his home and car on June 5, 2005. (§ 1538.5.) An evidentiary hearing on the motion was held on October 23, 2006. The court denied the motion in a written order filed on January 2, 2007. The jury was sworn to try the case on June 27, 2007, and returned its first degree murder verdict on July 17, 2007. On March 20, 2008, the trial court sentenced defendant to state prison for 25 years to life. Notice of appeal was timely filed.

## STATEMENT OF FACTS

*Facts Adduced at the Suppression Hearing*[2]

On June 5, 2005, at approximately 9:46 p.m., a woman who identified herself as Christy Gonzales called the Santa Clara Police Department's

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] A transcript of the original call to the Santa Clara Police Department's dispatcher was admitted into evidence at the hearing pursuant to the parties' stipulation. At various points

nonemergency number and spoke with a dispatcher. She said she lived in Sacramento[3] and gave the dispatcher her phone number. She told the dispatcher that her mother lived with a boyfriend, Alexandre L. Hochstraser, and their two-year-old son, Daniel, and gave the address. She said she had "just found out that there was some domestic violence that happened today and now my mom um, is unavailable; no one can find her and the boy is home with the father and I'm just wondering if there's anything um, I can do or you can do or some sort of a report can be filed, you know, on her behalf . . . ?" She added that a half-hour earlier, her grandmother had notified her that "they were in a physical fight and he did strike her." Christy said her grandmother had "been trying to get in contact with my mother all day." She had "no idea at all" where her mother might have gone, but no one had heard from her. The dispatcher informed Christy that somebody would "go out there and check on the child and they also um, see what we can do." Christy thanked the dispatcher.

Santa Clara Police Officer Liepelt was dispatched to conduct a welfare check on the child and arrived at the address at 10:06 p.m. Officer Jennifer Lamendola had arrived at the address at 10:05 p.m. At that time, all Officer Liepelt knew was that "the reporting party could not reach the mother of the child. And apparently the child was supposed to be at the address with the father. And the reporting party wanted me to conduct a welfare check on the child, make sure it was okay." He also knew that the previous night the reporting party's mother had been involved in a domestic violence incident with the father of the child and that he was supposed to be at that address.

Officers Liepelt and Lamendola walked upstairs and found the apartment completely dark. The front door was secured and the blinds were shut, but one of the windows was open approximately one-half to one inch. There was no sound coming out of the apartment. For 30 to 40 seconds, Officer Liepelt banged on the front door with his flashlight, knocked on the window with his hand, repeatedly asked out loud if anybody was inside, and identified himself as Santa Clara police. After getting no response from anyone inside the apartment, he believed there was "most likely nobody inside." He called the reporting party, Christine Gonzales, from his cell phone.

---

during the hearing, the witnesses' memories were refreshed with, or impeached by, the preliminary hearing transcript. Because the facts developed at trial were not before the court on the motion to suppress, we do not summarize them.

[3] A caller could not have reached the Santa Clara Police Department by calling "911" from Sacramento.

Christine Gonzalez identified herself as the daughter of Dolores Gonzales and the aunt of Daniel Gonzales.[4] Christine said that earlier that morning she had received a phone call from her grandmother who lives in the Hollister area. Her grandmother told her that Dolores had been involved in a domestic violence incident with her live-in boyfriend, defendant. Christine had tried to call Dolores several times on both the landline in the apartment and on Dolores's cell phone but had not reached her. According to Christine, this was extremely unusual, as her mother always had her cell phone with her and she had no mode of transportation, "so it was very suspicious that she could not reach her mom either at the apartment or on her cell phone." Defendant and Dolores shared one car, a Volkswagen Beetle associated with defendant. Christine was concerned about her mother, Dolores, as well as Daniel, the two year old.

Officer Liepelt and Christine discussed whether she was going to come to the apartment. Christine said she lived in the Sacramento area and it would take her about two hours to arrive at the apartment with a key, but she indicated that she wanted him to continue his welfare check to see if anyone was in the apartment.

Officer Liepelt did not call Christine's grandmother.

The additional information Officer Liepelt received from Christine aroused his "suspicion that we needed to do a welfare check because of prior domestic violence that was reported the night before between Dolores and Alex" and because "[h]istorically, Santa Clara has a large percentage of prior domestic violence related homicides." One of his concerns was that someone might be seriously injured and incapacitated inside the apartment and unable to respond to the officers' attempts to make contact. This concern was "heightened" after Officer Liepelt spoke with Christine, and he felt it was necessary to investigate it fully before leaving the premises. Liepelt called and consulted with his supervisor, Sergeant Steve Brauer. Sergeant Brauer decided he would come over to assist.

Sergeant Brauer arrived at 10:30 p.m. Officer Liepelt told Brauer that "he and Officer Lamendola had received a call of a welfare check, in other words, to go check on the welfare of someone. And that, evidently, a family member had called our police department and said that they had not heard from their family member for several hours, and that that was very unusual. [¶] They hadn't been able to make phone contact or anything like that. And they asked that we go check." Officer Liepelt also told him that Dolores had not been

---

[4] To avoid any confusion occasioned by use of the same surname, we will hereafter refer to the members of the Gonzales family by their first names; no disrespect is intended.

heard from all day, that there had been a domestic violence incident between Dolores and the father of her child the evening before, and that family members were also concerned about the welfare and whereabouts of the couple's two-year-old child. He also told Brauer that Dolores's daughter was en route to the Santa Clara residence from the Sacramento area, but that she would not arrive for about two hours. Based on everything he knew at that point, Sergeant Brauer made the decision to go in "[b]ecause there could have been someone injured or hurt inside that needed help" and he instructed Officer Liepelt to enter the apartment through the window. Sergeant Brauer considered entry into the residence urgent because "[t]he No. 1 thing was that it was unusual for the family not to have heard from [Dolores] in such a long time. They had just had a domestic incident the night before. And being that the window was slightly ajar, I figured we could get in with the least intrusion and do a quick search. That's pretty standard procedure." He did not consider waiting two hours for the daughter to arrive.[5]

About three minutes later, Officer Liepelt entered the apartment's living room by removing the screen from the already open window in front of the landing, and pushing it open. He then opened the front door to let the other two officers in. The apartment was "pitch dark."

The officers identified themselves as Santa Clara police officers. There was absolutely *no response*. Using their flashlights, they systematically searched the apartment from front to rear for any occupants inside, to check on their welfare. Inside the last bedroom checked, Officer Liepelt saw defendant sitting on a bed. The room was "completely dark" and the bedsheets were on the floor. There was a cold draft inside the room coming from an open window. A cell phone, which was turned off, was on the bed next to defendant's leg and there was a landline phone on a table next to the bed. When the police officers entered the room, defendant looked up and pulled a pair of earplugs from his ears; he looked surprised.

Officer Liepelt told defendant that they were there to conduct a welfare check of his girlfriend and his son. Since they were not in the apartment, Liepelt asked defendant about their whereabouts. Defendant said that Dolores was not home. He acknowledged that the previous night he and Dolores had had an argument during which they pushed each other, she fell, and she cut her chin. He had redness on his face and cuts on his hands, which he said were

---

[5] Sergeant Brauer explained that at this juncture, he considered the options of kicking in the door or waiting two hours for the family member to arrive. However, "normally" or "usually" the police would not wait two hours to conduct a welfare check. He had been in situations where "people inside were on the floor injured and couldn't get to the door, couldn't make sounds. . . ." He did not have to break down the door because the window was open and they could get in easily.

injuries he received during the argument. After the fight, each of them reported the incident to his or her family. Defendant said Dolores had left earlier that morning after the argument and he let her go.

He drove his son, Daniel, up to his mother's house in San Francisco that morning. He said he had not seen Dolores since that morning and that he had tried calling her on her cell phone once but she did not answer the phone. He said he dropped his car off and took his mother's Jetta. While the police were questioning defendant, the landline phone rang two or three times. Defendant made no attempt to answer it. The answering machine picked up the call, but Officer Liepelt could not hear what the caller said because the volume was all the way down.

According to Officer Liepelt, defendant's demeanor was withdrawn, emotionless, and unconcerned about Dolores's safety or welfare. Brauer described defendant's affect as "spacey." He testified: "I felt like he was almost like looking through me. It was weird. I just had a really weird feeling about his whole demeanor, it was very strange." When the police started asking him pointed questions, defendant "seemed very evasive and extremely vague about what had happened during the day, where [Dolores] might be." He began answering questions with questions; he never answered a question, he just repeated it.

Officer Earl Amos went to the apartment of his own accord, arriving at the apartment with Officer Eric Lagergren, a trainee, about five minutes after the others. Sergeant Brauer told him that they were doing a welfare check, looking for a female and a small child. Officer Amos began "poking around, looking to see if there's any evidence of anything" in plain view, which is one of the things he does whenever he enters a residence. As he walked through the apartment, he was struck by the smell of fresh bleach or cleanser and paint,[6] which was at odds with the unkempt condition of the apartment. He also noticed three or four Sawzall blades[7] sitting on the arm of the couch. One was used, as indicated by the fact that the painted area in the middle of the blade was all worn off. The others had no such wear. Sergeant Brauer noticed more blades on the kitchen table. The bathroom was clean and smelled very strongly of bleach.

---

[6] Sergeant Brauer also smelled a "chloriney [*sic*] kind of cleanser type smell" throughout the apartment after Officer Liepelt pointed it out to him.

[7] Officer Amos explained that "[a] Sawzall blade is a saw blade approximately six to eight inches long, one end of that blade attache[s] to a device commonly called a Sawzall, but essentially, it's a reciprocating saw, instead of going round and round, goes back and forth. These blades attach by a bolt hole on the end of each blade and it has a regular saw blade hand on it with the serrated teeth."

In the kitchen, Officer Amos located a small fanny pack in plain view on a small kitchen table. Sergeant Brauer was with Amos when he found it.[8] The zipper along the top was two-thirds to three-quarters of the way open and Officer Amos could see inside it a wallet of the type commonly used by females. Shining his flashlight inside the pack, Officer Amos could see a female's driver's license photo. He removed the wallet without unzipping the pack and determined that the driver's license belonged to Dolores. The pack also contained a cell phone, keys, ATM and credit cards, and some other personal items. He communicated this information to Sergeant Brauer.

Sergeant Brauer asked defendant "why Dolores would be gone without" her keys, identification, and phone. Defendant responded with "a blank look on his face and really didn't have an answer."

Sergeant Brauer asked defendant if the police could look inside the Jetta. Defendant asked why they wanted to look into it. Brauer explained that "we were investigating the disappearance of two people and we needed to be very thorough." Defendant responded that he would rather they not search the car.

Sergeant Brauer made the decision to look inside the Jetta, despite defendant's answer. One of the officers got a key to the car from defendant and gave it to Officer Amos.[9] Sergeant Brauer could see the car downstairs by looking out the window in the apartment. Officer Amos looked inside. There was a tarp on the floor and several Rubbermaid containers stacked on the rear seat, and one on the front seat. The containers were opaque. When Sergeant Brauer saw the containers, he wondered "why [defendant] had a bunch of plastic boxes." It reminded him of a case he had had less than a year before where he had discovered a dead female folded up inside a Tupperware bin found in a car parked at a gas station. The bins inside the Jetta were similar to the Tupperware bins in the prior case[10] and in both cases the bins contained plastic garbage bags. He made the decision to enter the Jetta and look inside the bins "[b]ecause we were looking for a woman and baby. . . . [¶] . . . [¶] . . . [S]he had been missing for several hours [and] all of her personal things and the fanny pack [were] sitting on the table, and the defendant [was] not knowing anything or acting like he didn't know anything about it, his evasiveness." Other factors that contributed to his decision to enter the car and view the bins included (1) the similarity of the Tupperware bins in the

---

[8] At the preliminary hearing, Sergeant Brauer testified that *he* was the one who " 'found a fanny pack with the victim's identification.' " At the suppression hearing, Sergeant Brauer explained that Officer Amos was with him when he found the fanny pack, and that he (Brauer) may have opened it all the way after finding it "roughly half" unzipped.

[9] Officer Amos recalled that Liepelt gave him the key, but Liepelt recalled that it must have been one of the other officers at the scene and Sergeant Brauer could not recall if there was a key.

[10] The prior case was Santa Clara case No. 04-7719 and the victim was Connie Yon.

Yon case; (2) the fact that defendant "wasn't acting . . . like a concerned husband or boyfriend"; (3) the domestic violence incident the night before; (4) the fact that defendant did not want them to look in the car; (5) the fact that he claimed not to have heard the police banging on the door and announcing themselves; (6) the presence of the saw blades; and (7) the smell of chlorine bleach which "people use . . . to clean up crimes scenes." "It wasn't just one thing, it was the totality of the situation." Sergeant Brauer wanted to make sure the woman or the baby was not there.

Sergeant Brauer instructed Officer Amos to enter the Jetta, which was unlocked. Officer Amos did so and then opened the snap-on top of a container that was 18 to 20 inches deep, 18 inches wide, and 30 inches long. Inside the container was a garbage bag, which he also opened. Inside the bag Officer Amos found "a mound of human flesh." He stopped searching and notified Sergeant Brauer who also looked inside and saw the human flesh of what looked like an adult.

Officer Amos shut the car door.

From the landing, Officer Liepelt watched as Amos opened the container. Liepelt could not see what was inside the container, but Sergeant Brauer told Officer Liepelt that he had found body parts. Sergeant Brauer instructed Officer Liepelt to handcuff defendant. Liepelt then walked back into the apartment and ordered Officer Lagergren to handcuff defendant.

Officer Liepelt called Ilsa Hochstraser, defendant's mother, on defendant's cell phone to check on Daniel's welfare. He identified himself to defendant's mother as a police officer and inquired about Daniel's whereabouts and well-being. Defendant's mother confirmed that Daniel was at her house in San Francisco. Officer Liepelt heard a child's voice in the background. He was not satisfied at that point that Daniel "was okay and was with her." He and Officer Crescini drove to Mrs. Hochstraser's residence in San Francisco "to make contact and check the welfare of the child." They arrived at her house about 12:45 a.m. the next morning. She invited them in. He told Mrs. Hochstraser only that he was conducting an investigation of an incident at the residence in Santa Clara and was at her house to check on Daniel's welfare. Daniel was sleeping on the couch; he had a fever and was not feeling well. Mrs. Hochstraser permitted the police to look around the house for evidence. They visually inspected defendant's Beetle at that time, and asked Mrs. Hochstraser for written consent to search her Jetta, which she gave. She said she and defendant had exchanged cars the day before so that he could move some belongings, and that he was supposed to have returned her car to her at 8:00 p.m. that evening. Officer Liepelt did not tell Mrs. Hochstraser that the police had already searched the Jetta, or that Dolores was dead, or that defendant was under arrest.

*Trial Court's Written Decision*

After reciting the relevant facts presented at the preliminary hearing and the motion to suppress, the trial court found that (1) the warrantless entry into the apartment was not justified under the exigent circumstances exception to the warrant requirement of the Fourth Amendment because the police officers could not rely upon their prior experience with domestic violence arrests to justify the warrantless entry, and "the circumstances 'fell short' of supplying 'probable cause to believe there was someone in the apartment who was either in danger or dangerous to them,' " citing this court's opinion in *People v. Ormonde* (2006) 143 Cal.App.4th 282 [49 Cal.Rptr.3d 26]. The trial court also found that (2) the warrantless entry into the apartment was justified by the community caretaking exception to the warrant requirement, as explained in the lead opinion authored by Justice Janice Rogers Brown in *People v. Ray* (1999) 21 Cal.4th 464 [88 Cal.Rptr.2d 1, 981 P.2d 928] (*Ray*). In addition, the trial court found that (3) defendant lacked standing to complain about the search of Dolores's fanny pack. Finally, the trial court found that (4) while conducting their welfare check for Dolores (and Daniel) inside the apartment, the police developed probable cause to believe that Dolores (or Daniel) had met with foul play and that evidence relating to their disappearance would be found in defendant's mother's car; thus, the search of the car and its containers was justified by the automobile exception to the warrant requirement. (*California v. Acevedo* (1991) 500 U.S. 565 [114 L.Ed.2d 619, 111 S.Ct. 1982].) In a footnote, the trial court also concluded that the doctrine of inevitable discovery was inapplicable.

## DISCUSSION

Defendant argues that (1) substantial evidence supports the trial court's finding that exigent circumstances did *not* exist; (2) the trial court erred in finding that the community caretaking exception to the warrant requirement applied here; (3) no other exception justified the warrantless entry into the apartment; (4) alternatively, if the warrantless entry was justified as an exercise of the community caretaking function, the search was illegally extended to a criminal investigation; (5) the automobile exception did not apply to the search of defendant's mother's car; (6) the exclusionary rule requires suppression of all the evidence; and (7) counsel was ineffective for failing to argue that the automobile exception was inapplicable here.

While this case was pending, our Supreme Court decided in *People v. Rogers* (2009) 46 Cal.4th 1136 [95 Cal.Rptr.3d 652, 209 P.3d 977] (*Rogers*), that exigent circumstances justified entry and search of storage rooms controlled by the defendant to look for the murder victim (the mother of the defendant's child), based on a missing person report made by the victim's

mother. Given the similarity of issues, we asked the parties to submit supplemental briefing on the *Rogers* case. For the reasons we discuss below, we now find that *Rogers* is controlling on the question whether the situation confronting the officers in this case gave rise to exigent circumstances.

As we explain below, in our view the entry and search of the apartment were justified by exigent circumstances—the urgent need to locate Dolores and Daniel and verify their well-being. In addition, we find that by the time the police searched the car, they had developed probable cause to believe that it contained evidence of a crime relating to the disappearance of Dolores or Daniel. Therefore, we need not and do not address defendant's arguments concerning the reach of the exclusionary rule, the effectiveness of his trial counsel, or the applicability of the community caretaking function exception to the warrant requirement as described in *Ray, supra,* 21 Cal.4th at pages 471–472 (lead opn. of Brown, J.), or consent.[11] (See *Rogers, supra,* 46 Cal.4th at p. 1161, fn. 12 [having found exigent circumstances, no need to consider alternative justification theory of inevitable discovery].)

1. *Standard of Review*

" 'When reviewing a ruling on an unsuccessful motion to exclude evidence, we defer to the trial court's factual findings, upholding them if they are supported by substantial evidence, but we then independently review the court's determination that the search did not violate the Fourth Amendment.' " (*People v. Panah* (2005) 35 Cal.4th 395, 465 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*).) This means that we must measure the facts, as found by the trial court, against the constitutional standard of reasonableness for the search and/or seizure (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597 [174 Cal.Rptr. 867, 629 P.2d 961]) but we "decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure" (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922 [21 Cal.Rptr.2d 785]). We will affirm the trial court's ruling if correct on any theory of applicable law. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

California law requires that the reasonableness of searches and seizures undertaken by the police be reviewed under federal constitutional standards. (*Rogers, supra,* 46 Cal.4th at p. 1156, fn. 8.)

---

[11] We also requested supplemental briefing on the question whether the entry and search of the apartment were justified by consent of a keyholder.

## II. *Exigent Circumstances*

█ "The Fourth Amendment to the federal Constitution guarantees against unreasonable searches and seizures by law enforcement and other government officials. Because a warrantless entry into a home to conduct a search and seizure is presumptively unreasonable under the Fourth Amendment [citation], the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry." (*Rogers, supra*, 46 Cal.4th at p. 1156, fn. omitted.)

" '[W]arrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' " (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 126 S.Ct. 1943] (*Brigham City*).) One such exigency is presented by " ' "[t]he need to protect or preserve life or avoid serious injury . . . ." ' " [Citations.] Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (*Ibid.*) Moreover, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' [Citation.] The officer's subjective motivation is irrelevant." (*Id.* at p. 404.)

█ Our Supreme Court is in accord. "[T]he exigent circumstances doctrine constitutes an exception to the warrant requirement when an emergency situation requires swift action to prevent imminent danger to life. [Citation.] . . . In this regard, ' " [t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' [Citation.] Generally, a court will find a warrantless entry justified *if the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate.*" (*Rogers, supra*, 46 Cal.4th at pp. 1156–1157, italics added.)

In *Rogers*, our Supreme Court concluded that "the circumstances known to Detective Carlson established an objective emergency requiring immediate action. On March 11, 1996, Carlson received a missing person report containing apparently reliable information that Beatrice Toronczak, the mother of defendant's young child, had been missing from defendant's apartment since approximately February 18, 1996. Carlson spoke directly with Slimak, the person making the report, and she confirmed the circumstances of Toronczak's disappearance as related to her by Toronczak's mother, Bartosz. Bartosz had tried unsuccessfully to locate Toronczak through

defendant and others, and she could not get defendant to report Toronczak as missing. Bartosz had previously observed defendant threaten to lock Toronczak in the basement storage area of the complex. Because Bartosz believed he meant it, she insisted that Slimak tell the authorities to look in that area for the daughter. Apart from Slimak and Bartosz, neighbors at the complex confirmed that Toronczak had not been seen for several weeks and that defendant controlled the keys to the storage rooms. The significance of the foregoing information was heightened because defendant gave Carlson wrong information about the length of time Toronczak had been missing, and he exhibited no concern over her unexplained disappearance. When Carlson mentioned defendant's threat to lock Toronczak in the basement storage area, defendant's neck started to visibly throb, adding to Carlson's concern. Defendant never denied making any threat, and he never denied that Toronczak was in any of the storage rooms when Carlson repeatedly sought permission to look there for her." (*Rogers, supra*, 46 Cal.4th at p. 1159.)

The *Rogers* court rejected the defendant's argument that "the circumstances here did not establish the requisite emergency because: (1) there were no obvious signs of an emergency, such as moans, groans, or chemical smells emanating from the storage rooms, and there had been no gunshots or fire; (2) the mere 'possibility' that Toronczak was in the storage room against her will did not justify an emergency entry; (3) before his entry, Carlson did not believe he had probable cause to obtain a warrant; (4) the information regarding defendant's supposed threat to lock Toronczak in the basement was nonspecific and did not indicate a present emergency in the storage rooms; (5) Carlson's delays in investigating the storage rooms were not consistent with his professed belief that an emergency situation existed; and (6) even if the officers had probable cause to enter the storage rooms with a warrant, the failure to obtain a warrant made the inevitable discovery doctrine inapplicable. These contentions do not aid defendant's position. [¶] As explained, there is no bright-line rule for determining whether exigent circumstances exist; rather, courts must approach each claim of an extraordinary situation by looking at the totality of the particular circumstances known to the searching officer. [Citation.] Here, the absence of any information suggesting Toronczak was dead, defendant's noticeable lack of concern over the whereabouts of his child's mother, Bartosz's report of, and evident belief in, defendant's threat to lock Toronczak in the basement, defendant's physical reaction when Carlson mentioned that threat, and defendant's sole control over the storage rooms, all contributed to Carlson's sense of urgency about entering the storage rooms immediately to look for Toronczak, who might have been imprisoned there against her will. [¶] Because the totality of the circumstances must be considered, the fact that certain circumstances were not present here, such as certain noises or smells, or gunshots or fire, does not defeat the finding of an emergency. [Citation.] Moreover, the length of time Toronczak had been

reported as missing, i.e., three weeks instead of only hours or days, did not negate the emergency nature of the situation in light of the other circumstances known to Carlson. [Citation.] Finally, it makes no difference that Carlson could perhaps have acted even more quickly in trying to find Toronczak, or that he subjectively believed he could not have obtained a search warrant based only on the information he possessed prior to entering the three storage rooms. That is because the relevant inquiry remains whether, in light of all of the circumstances, there was an objectively urgent need to justify a warrantless entry." (*Rogers, supra*, 46 Cal.4th at pp. 1159–1160, fn. omitted.)

■ The *Rogers* court relied on *People v. Lucero* (1988) 44 Cal.3d 1006 [245 Cal.Rptr. 185, 750 P.2d 1342] (*Lucero*), *People v. Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290] (*Wharton*), and *Panah, supra*, 35 Cal.4th 395 for the proposition that "a warrantless entry may be appropriate when the police ' "seek an occupant reliably reported as missing." ' " (*Rogers, supra*, 46 Cal.4th at p. 1157.)

In *Lucero*, "two girls were reported missing after they went to a park and failed to return, and a fire of unknown origin had ignited in the defendant's house, located directly across the street from that park. [Citation.] After extinguishing the fire, firefighters discovered what appeared to be a large bloodstain on the living room carpet and decided it should be examined by law enforcement officers." (*Rogers, supra*, 46 Cal.4th at p. 1158; see *Lucero, supra*, 44 Cal.3d at p. 1012.) Two law enforcement officers entered the house without a warrant and viewed the bloodstain, and then immediately radioed their sergeant. When the sergeant arrived and entered the house, "he had just learned that the body of one of the missing girls was discovered in the dumpster of a neighborhood grocery store." (*Rogers*, at p. 1158; see *Lucero*, at pp. 1016–1017.) The sergeant advised the fire captain about the missing children and " 'asked him to order his men into the burning house with oxygen equipment to look for the girls. [¶] The report of the bloodstain was another unusual circumstance adding weight to the suspicion that the house and the missing girls might be connected. The presence of blood also suggested that the children were in serious danger. At the time of [the sergeant's] entry the body of one of the girls had just been found, making it likely that the second girl was in imminent danger and making discovery of her location even more urgent.' " (*Rogers*, at pp. 1158–1159; see *Lucero*, at p. 1017.) The combination of circumstances "clearly created an emergency situation requiring swift action." (*Lucero*, at pp. 1017–1018; see *Rogers*, at p. 1159.)

In *Wharton*, two police officers entered an apartment the defendant shared with the murder victim, which eventually led to the discovery of the victim's

body. At the time they made entry, the officers knew that "earlier in the month, the police had responded to a domestic disturbance reported at the victim's residence; earlier on the day of the entry, the victim's neighbors had reported they had not seen her in two weeks, and a note had been left in the home asking the victim to call police, but no call was received; the police had received two calls expressing concern for her welfare; mail in the victim's mailbox indicated she had not been home; and [the officers] had gone to the home in response to a neighbor's report that someone had been banging on the victim's front door, and they found the door unlocked." (*Rogers, supra*, 46 Cal.4th at p. 1157; see *Wharton, supra*, 53 Cal.3d at pp. 576–577.) The *Wharton* court concluded that "the totality of these circumstances . . . demonstrated an emergency situation sufficient to justify the officers' warrantless entry." (*Rogers*, at p. 1157; see *Wharton*, at p. 577.)

In *Panah*, the father of the eight-year-old murder victim, Nicole, called the police after being unable to locate his daughter at their apartment complex for about two hours. (*Panah, supra*, 35 Cal.4th at p. 411.) The police arrived shortly thereafter at 1:15 p.m. and set up a command post. "The first entry into defendant's apartment, unit 122, occurred sometime after 5:30 p.m. on November 20. Around 4:30 or 5:00 p.m., as part of a door-to-door search of the apartment complex, Officer Ruth Barnes and her partner knocked at the door of defendant's apartment and received no response, but she observed the television was on. She went back a second time at roughly 5:30 p.m. and knocked again. There was no response but she observed the television set was now off. A neighbor told her that a woman and a young man in his 20's lived in the apartment. Barnes reported her information to Sergeant Patton. Patton had independently learned that Nicole had been observed speaking to a male occupant of unit 122. Based on this information, Patton obtained a key from the manager and he and Barnes and two other officers entered the apartment to look for Nicole. The search lasted between five and 15 minutes. The officers checked the rooms upstairs and downstairs. Officer Barnes testified she did not search closets or look under beds while Sergeant Patton testified he checked closets. When they did not find Nicole, they left and the manager of the complex locked the door." (*Id.* at p. 465.) The *Panah* court concluded that the search was justified by exigent circumstances. It rejected the defendant's contention that "in addition to exigent circumstances, the police were required to have had probable cause to believe Nicole was in the apartment," stating that "the circumstances known to Sergeant Patton sufficiently established probable cause for the brief entry into defendant's apartment." (*Id.* at p. 466.)

In this case, the trial court did not have the benefit of the Supreme Court's analysis in *Rogers* when it concluded that the initial entry into defendant's apartment was *not* justified by exigent circumstances. The court stated: "Based upon the People's evidence, the justifications for the warrantless entry

were that the victim and her son had not been heard from since earlier that day and the victim had been involved in a domestic violence dispute the night prior. [¶] While one of the officers testified that Santa Clara has a disproportionate amount of domestic violence related homicides; '[n]evertheless, to say that the warrantless entry into defendant's home in this case was justified because of a police officer's past experiences with domestic violence arrests would be tantamount to creating a domestic violence exception to the warrant requirement. This we cannot do.' (*People v. Ormonde*[, *supra*,] 143 Cal.App.4th [at p.] 295 . . . .) [¶] Moreover, the circumstances 'fell short' of supplying 'probable cause to believe there was someone in the apartment who was either in danger or dangerous to them.' (*People v. Ormonde, supra*, 143 Cal.App.4th [at p.] 292.)"

The trial court distinguished two of the three "missing person" cases on which the *Rogers* opinion had relied. For example, it concluded that despite the fact that the victim in *Wharton* "had been involved in a domestic disturbance earlier in the month" and "had been missing for two weeks," *Wharton* was distinguishable because "[s]everal additional circumstances which are not present in the instant case supported the court's finding of exigency." Similarly, the trial court also distinguished *Panah*, where "a child victim vanished . . . while playing around her apartment complex" and "[f]ollowing hours of searching, the police decided to warrantlessly enter the apartment where the victim had last been seen," because "in *Panah*, there were sounds of an on-and-off television in the apartment indicating that someone might be inside."

In our view, the salient feature of *Lucero, Wharton, Panah* and *Rogers* remains that a reliable missing person report was made under circumstances known to the investigating officers which strongly suggested that the missing person was injured or worse, and would cause a reasonably cautious person to believe that the action taken was appropriate. In this case, at the time Sergeant Brauer made the decision to enter defendant's apartment in search of Dolores and Daniel, he knew that Officers Liepelt and Lamendola "had received a call of a welfare check, in other words, to go check on the welfare of someone. And that, evidently, a family member had called our police department and said that they had not heard from their family member for several hours, and that that was very unusual. [¶] They hadn't been able to make phone contact or anything like that. And they asked that we go check." Officer Liepelt also told him that Dolores had not been heard from all day, that there had been a domestic violence incident between Dolores and the father of her child the evening before, and that family members were also concerned about the welfare and whereabouts of the couple's two-year-old child. He also told Brauer that Dolores's daughter was en route to the Santa Clara residence from the Sacramento area, but that she would not arrive for about two hours. Based on everything he knew at that point, Sergeant Brauer

made the decision to go in "[b]ecause there could have been someone injured or hurt inside that needed help" and he instructed Officer Liepelt to enter the apartment through the window. Sergeant Brauer considered entry into the residence urgent because "[t]he No. 1 thing was that it was unusual for the family not to have heard from [Dolores] in such a long time. They had just had a domestic incident the night before." The urgency of the situation was underscored by the fact that Dolores's daughter was willing to travel for two hours in the middle of the night to make sure that Dolores and Daniel were safe, and that she was already en route. It was also underscored by the fact that, at 10:30 p.m., loud knocking and shouts of police did not arouse cries of surprise or alarm from a small child.

Focusing on Officer Liepelt's testimony that his subjective concern was heightened because "[h]istorically, Santa Clara has a large percentage of prior domestic violence related homicides," and relying on this court's opinion in *Ormonde*, the trial court erroneously concluded that finding exigent circumstances here would be tantamount to creating a domestic violence exception to the warrant requirement. We disagree. While the incident of domestic violence the night before in this case was certainly a factor—and an important one—justifying the entry in this case, it was but one of many circumstances known to Sergeant Brauer which objectively contributed to the exigency calculus. By contrast, Officer Liepelt's subjective state of mind concerning Santa Clara's crime statistics was "irrelevant." (*Brigham City, supra*, 547 U.S. at p. 404.)

Furthermore, our *Ormonde* decision is inapposite here. In that case, the victim of the domestic violence incident was not *missing*. Rather, at the time the police entered the defendant's apartment, they knew that the domestic violence victim was safely away from the premises; there was *no* possibility that she could be inside the apartment injured, in need of emergency aid, and unable to call for help. Nor did the police officers articulate any reason to believe that other domestic violence victims or suspects were inside the apartment. (*People v. Ormonde, supra*, 143 Cal.App.4th at pp. 291–292.) Thus, the fact that an incident of domestic violence had occurred in the car outside the apartment contributed nothing to the police officers' justification for entering the apartment.

Here, as in *Rogers*, defendant lists a number of factors which, he asserts, militate against a finding of exigent circumstances, such as: (1) Christine called the regular police number, not 911; (2) Officers Liepelt and Lamendola concluded there was no one inside the apartment; (3) defendant's car was gone; (4) Officer Liepelt's call to Sergeant Brauer was not urgent; (5) Brauer did not arrive immediately, but first finished the investigation on which he was working; (6) Liepelt had information that, as of the morning after the

domestic violence incident, Dolores was physically fine and was not requesting help; (7) the police did not check with the neighbors; (8) they did not call Dolores's mother; (9) they did not check to see if defendant had warrants, an arrest record, or was on probation; (10) they acted pursuant to a "policy" of entering when there is a chance someone is inside, it is an odd or unusual situation, the family has not heard from someone in a long time, there has been domestic violence, and the police can get in with the least intrusion to do a quick check.

We are not persuaded that any of these factors outweighed the factors favoring swift action to determine whether two missing persons, one of them a two-year-old child, were in need of emergency aid or were safe and sound inside their apartment. *Rogers* teaches that the totality of the circumstances must be considered, and the fact that certain circumstances were not present does not defeat the finding of an emergency. We note that here, the length of time Dolores had been reported missing was a matter of hours, rather than weeks, a fact which the *Rogers* court suggested enhances rather than negates the emergency nature of the situation. Likewise, it makes no difference here that Sergeant Brauer arrived possibly 15 minutes later than he could have, or that Christine did not call 911 to reach the Santa Clara police from Sacramento, "because the relevant inquiry remains whether, in light of all of the circumstances, there was an objectively urgent need to justify a warrantless entry." (*Rogers, supra*, 46 Cal.4th at pp. 1160–1161.) In our view, *Rogers* and the cases cited therein compel the conclusion that the totality of the circumstances here justified the entry into defendant's apartment to ascertain whether Dolores and Daniel were injured inside.

### III. *The Search of the House and the Car*

Defendant challenges the search of the house and the car on two grounds. First, he argues that even if the initial entry was justified, subsequent searches of the apartment and the car were "illegally extended to a criminal investigation, beyond the limitations of any community caretaker justification to render emergency aid to someone inside the home." He also argues that the automobile exception to the warrant requirement did not apply to the search of defendant's mother's Jetta, which was parked in the carport below defendant's apartment. For the reasons explained below, we reject both arguments.

 Defendant's first argument presupposes that the entry here was justifiable pursuant to the community caretaker function exception as described in the lead *Ray* opinion, which holds that "[a]ny intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives." (*Ray, supra*, 21 Cal.4th at p. 477.) However, we

have found that the entry was justified by exigent circumstances, which is not subject to any such restriction. On the contrary, " '[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." (*Mincey v. Arizona* (1978) 437 U.S. 385, 392–393 [57 L.Ed.2d 290, 98 S.Ct. 2408].)

Defendant relies on *Michigan v. Clifford* (1984) 464 U.S. 287 [78 L.Ed.2d 477, 104 S.Ct. 641], for the proposition that the police here were required to cease their investigation of Dolores's and Daniel's location and welfare to secure a warrant "once police entered Mr. Hochstraser's home, surveyed the rooms, and determined no one was present who required emergency aid." We disagree. *Clifford* involved a second search of a house to investigate criminal arson after the initial firefighters had put out the blaze and left the premises. The *Clifford* plurality invalidated the second search, but exempted from exclusion all evidence that was seen in plain view. (*Id.* at pp. 294–295.)

Here, the evidence in "plain view" included the open window on a cold and windy night, which did not completely dispel a "chloriney" smell reminiscent of a crime scene cleanup; the spotless bathroom in an otherwise messy apartment; Sawzall blades in the kitchen and living room; the victim's fanny pack, cell phone, keys, and identification on the kitchen table; defendant's "spacey" demeanor and lack of concern for Dolores's welfare or whereabouts; the facial redness and cuts on his face and hands, and his admission that he had suffered them in a physical altercation with Dolores the previous night; and his disregard for the ringing telephone. Especially when coupled with defendant's evasive and contradictory statements, his stated desire that the police *not* search the car, and the fact that neither Dolores nor Daniel was safe and sound in the apartment, "it would have constituted a dereliction of duty for [the police] to turn around and abandon [their] investigation" of Dolores's and Daniel's whereabouts and welfare. (*People v. Seminoff* (2008) 159 Cal.App.4th 518, 529 [71 Cal.Rptr.3d 582].)

 "If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820–821 [72 L.Ed.2d 572, 102 S.Ct. 2157] (1982), authorizes a search of any area of the vehicle in which the evidence might be found." (*Arizona v. Gant* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 485, 129 S.Ct. 1710, 1721].) Defendant does not actually argue, on appeal, that the police lacked probable cause to search defendant's mother's Jetta. Instead, he argues that probable cause was disputed in the trial court, that the trial court found the police had probable cause to believe that the car contained evidence of a crime, and that the trial court's findings are subject to substantial evidence review. He states: "The findings are not

challenged here because of the deferential standard of review." However, he maintains that a neutral and detached magistrate could have found otherwise, and that conclusion would also be supported by substantial evidence. To the extent defendant is arguing that probable cause to search the Jetta for evidence of a crime relating to the disappearance of Dolores and Daniel was lacking, we disagree. In our view, the evidence discovered by the police in plain view following their entry into the apartment supplied ample probable cause to search the car for evidence of a crime.

Relying primarily on language in *California v. Carney* (1985) 471 U.S. 386 [85 L.Ed.2d 406, 105 S.Ct. 2066] (*Carney*), defendant next argues that the police were required to obtain a search warrant before searching the car in which Dolores's dismembered body parts were found, because the car was parked at or near defendant's apartment in a carport and was therefore not subject to the automobile exception to the warrant requirement.[12] Again, we disagree.

In *Carney*, police searched a Dodge Mini motor home that was parked in a downtown San Diego parking lot after receiving an unconfirmed tip that the motor home was being used in the exchange of marijuana for sex, watching a youth enter the motor home with the defendant and emerge after one and one-quarter hours, detaining the youth and learning from him that he had received marijuana in exchange for sexual contact with the defendant. The warrantless search yielded marijuana and paraphernalia used in drug sales. (*Carney, supra,* 471 U.S. at pp. 387–388.) The court "granted certiorari to decide whether law enforcement agents violated the Fourth Amendment when they conducted a warrantless search, based on probable cause, of a fully mobile 'motor home' located in a public place." (471 U.S. at p. 387.) The court held that the Fourth Amendment was not violated because "the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met." (471 U.S. at p. 392.)

Defendant's argument depends entirely on the following sentence in *Carney*, which immediately follows the above quoted passage. "*When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play.*" (*Carney, supra,* 471 U.S. at pp. 392–393, italics added.) The court went on to say: "First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced

---

[12] Because we choose to address defendant's contention on the merits, we need not decide whether counsel was ineffective for failing to explicitly so argue in the trial court.

expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. At least in these circumstances, the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable. [¶] While it is true that respondent's vehicle possessed some, if not many of the attributes of a home, it is equally clear that the vehicle falls clearly within the scope of the exception laid down in *Carroll* [*v. United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280]] and applied in succeeding cases. Like the automobile in *Carroll*, respondent's motor home was readily mobile. Absent the prompt search and seizure, it could readily have been moved beyond the reach of the police. Furthermore, the vehicle was licensed to 'operate on public streets; [was] serviced in public places; . . . and [was] subject to extensive regulation and inspection.' [Citation.] And the vehicle was so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." (*Id.* at p. 393.)

Defendant argues: "Conversely, however, when a vehicle is *not* being used on the highways, and when it *is* found stationary at a place regularly used for residential purposes"—like an apartment building's carport—"the automobile exception does not 'come into play.' " We disagree. Viewed in the context of the whole opinion, it is obvious that the *Carney* court did not intend such a meaning. As the discussion following the disputed sentence makes even more clear, the twin justifications which make the automobile exception applicable to a vehicle "come into play" whenever a car is capable of being used as a car, i.e., for transportation, regardless of whether it happens to be parked in a carport next to a residence, on a public street in front of a residence, or in a downtown parking lot, as in *Carney*.

■ Rejecting the argument that the court should "distinguish his vehicle from other vehicles within the exception because it was *capable of functioning as a home*" (*Carney, supra*, 471 U.S. at p. 393) the court observed: "In our increasingly mobile society, many vehicles used for transportation can be and are being used not only for transportation but for shelter, *i. e.*, as a 'home' or 'residence.' To distinguish between respondent's motor home and an ordinary sedan for purposes of the vehicle exception would require that we apply the exception depending upon the size of the vehicle and the quality of its appointments. Moreover, to fail to apply the exception to vehicles such as a motor home ignores the fact that a motor home lends itself easily to use as an instrument of illicit drug traffic and other illegal activity. . . . [¶] Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation. These two requirements for application of the exception ensure that law

enforcement officials are not unnecessarily hamstrung in their efforts to detect and prosecute criminal activity, and that the legitimate privacy interests of the public are protected. Applying the vehicle exception in these circumstances allows the essential purposes served by the exception to be fulfilled, while assuring that the exception will acknowledge legitimate privacy interests." (*Carney, supra*, 471 U.S. at pp. 393–394, fn. omitted.) In a footnote, the court declined to decide whether the "automobile exception" should apply "to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road." (*Id.* at p. 394, fn. 3.)

In this case, defendant argues that the car was not "mobile or even potentially mobile because the police had the key." In our view, the car was "mobile" within the meaning of *Carney*. It can be inferred from the record that defendant's mother's car was an ordinary sedan, subject to governmental regulation and capable of being used as transportation on public streets. The automobile exception to the warrant requirement was fully applicable to the car in which Dolores's dismembered body was found.

Defendant argues that because the automobile exception to the warrant requirement was not met, the prosecution was required to show that exigent circumstances existed to search the car, which it did not do. For the reasons explained above, we find that the automobile exception applies and no warrant or exigent circumstances were required to search the car.[13]

## CONCLUSION

█ Exigent circumstances justified a warrantless police entry into defendant's apartment to determine whether a missing domestic violence victim and her two-year-old child were injured or safe. The search of defendant's mother's car, in which the domestic violence victim's dismembered body parts were found, was amply supported by probable cause to believe that evidence of a crime would be found therein and was subject to the automobile exception to the warrant requirement.

---

[13] In view of our disposition of the issues, we need not and do not decide whether the inevitable discovery doctrine applies here.

## DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 3, 2010, S178558. George, C. J., did not participate therein.