No. 105,588

STATE OF KANSAS, *Appellant*, v. JUSTIN W. NEIGHBORS, *Appellee*.

(328 P.3d 1081)

Opinion filed April 25, 2014.

*Amy L. Aranda*, senior assistant county attorney, argued the cause, and *Vernon E. Buck*, first senior assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellant.

*Stephen J. Atherton*, of Atherton & Huth, of Emporia, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: A warrantless entry into a private dwelling by law enforcement officers must fall within a recognized exception to the warrant requirement to be considered reasonable and valid under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights. In this case, we consider whether a warrantless entry by police and their ensuing search and seizure were justified under the emergency aid exception when officers entered a locked apartment to assist an unresponsive person but then began a criminal investigation once the individual was awake and clearly not needing emergency medical assistance. We hold the officers unreasonably exceeded the permissible scope of their warrantless entry and agree with the district court that the drug evidence obtained as a result should be suppressed.

In so ruling, we realign our previous Kansas test for applying the emergency aid exception (also referred to in our caselaw as the "emergency doctrine") with more recent decisions of the United State Supreme Court. See, *e.g.*, *Brigham City v. Stuart*, 547 U.S. 398, 403, 406-07, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (emergency aid exception allows warrantless entry into a dwelling when officers have objectively reasonable basis to believe an occupant is seriously injured or imminently threatened with serious injury). We reverse the Court of Appeals decision reversing the district court's suppression ruling and remand the case to the district court for further proceedings consistent with our ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

A landlord at an Emporia apartment complex used his key to enter a tenant's apartment when the rent was past due. The landlord testified he knocked and entered the apartment around 10:30 a.m. to see if it had been abandoned. As he entered, he saw a man lying on a couch. The man did not respond to the landlord's attempts to wake him up by yelling and beating on the door. The landlord called 911 and reported, "[T]here's someone in an apartment of mine, and I don't know who it is, and they won't wake

up." Two officers and two training officers responded at 10:35 a.m. to a "trespass problem."

Officer Lane Doty testified he approached the apartment with the landlord, knocked on the door, and identified himself as a police officer. Doty said there was no response. The landlord opened the door, and the officers could see from the doorway a person lying on the couch. Doty testified they attempted to wake him by yelling and again stated who they were. There was still no response. Officers then notified dispatch of the situation, indicating a concern for the unidentified man's safety. Doty testified, "We weren't sure what [the man's] health condition was, and we made entry."

But the officers were able to wake the defendant, Justin T. Neighbors, who initially appeared to be "groggy, very unstable." Doty testified Neighbors at first was not able to sit up. Doty said, "[H]e tried to verbalize things and tell us his name, and he was not able to do that for a little bit." Neighbors eventually did identify himself, and the officers reported his name to dispatch and confirmed he did not have any outstanding warrants.

The officers then began questioning Neighbors about whether he had permission to be in the apartment. Neighbors said he did and informed them the tenant was in jail in Morris County. The officers confirmed with the tenant through their central dispatch that Neighbors had permission to be in the apartment.

In the meantime, officers discovered a woman in the apartment's back bedroom. The officers had similar concerns regarding the woman's permission to be there, but they did not contact the tenant as they had done with Neighbors.

While this ensued, Officer Lance Delgado, a narcotics investigator, heard Neighbors' and the woman's names broadcast over his police radio. Delgado and Deputy Cory Doudican, a sheriff's deputy with the drug task force, recognized the names as drug offenders and drove to the apartment to investigate. Delgado and Doudican both arrived at 10:50 a.m. Doudican testified that within a few seconds after he entered the apartment officers told him Neighbors had permission to be there. The deputy immediately went to the bedroom to speak with the woman.

As Delgado entered the apartment, Neighbors was sitting on the couch. Delgado immediately approached Neighbors; observed a Q-Tip with black residue nearby, which can suggest drug use; and noted Neighbors "seemed a little sleepy." Delgado said Neighbors looked like a methamphetamine user because he was sweating profusely and gaunt. But Delgado also admitted Neighbors was awake and able to converse. Delgado testified he immediately asked Neighbors if he had any weapons on him. Neighbors said he had a knife in his pants. Delgado instructed him to stand against a wall while he patted him down for weapons and removed the knife.

After this first pat-down search, Delgado told Neighbors to sit on the couch and relax. But believing Neighbors was "possibly in possession of methamphetamine and/or drug paraphernalia," Delgado obtained consent to search Neighbors' outer clothing. After finding nothing, Delgado asked Neighbors for consent to search the pants underneath his outer pants. Neighbors paused for a moment but then consented. Delgado discovered a small bag of methamphetamine in the seam area of Neighbors' boxer shorts. Neighbors was arrested and charged with possession with intent to distribute within 1,000 feet of school property, failure to affix a drug tax stamp, and felony use or possession of drug paraphernalia.

It is not clear when Delgado was told Neighbors had permission to be in the apartment. Delgado testified he spoke to another officer while standing in the living room talking to Neighbors and that this officer told him the tenant had been contacted.

In pretrial proceedings, Neighbors filed a motion to suppress the drug evidence, alleging the warrantless entry and seizure of evidence violated the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights. Neighbors argued any justification for the warrantless entry based on the emergency aid doctrine dissipated before Delgado arrived and began a drug investigation. If so, Neighbors continued, the officers' continued presence and subsequent searches were unlawful.

The district court granted the motion to suppress after a hearing but without making any factual findings. The journal entry states only that the motion was granted. Accordingly, the district court's analysis must be gleaned from its comments during the hearing.

The district court held the officers' entry was proper given the landlord's testimony about an unresponsive person inside the apartment. But the district court found the emergency ended once the officers knew Neighbors was lawfully on the premises, which suggests the court believed the trespass investigation was part of the emergency. The court also stated it was not certain how much time elapsed between when Officer Doty learned Neighbors was lawfully present and when Delgado began questioning Neighbors, but it found Neighbors was illegally seized by that point because "the officers exceeded their time spent allowed in the apartment." The judge went on to hold:

"[I]t's really two separate investigations. And Delgado comes in later, goes straight to him inside the residence, and starts asking these questions and investigates the case.

"And really at that point, absen[t] some other manifestation of some sort of evidence that would indicate there were drugs on the premises, which I didn't see, that didn't exist. So I'm going to suppress the evidence based upon exceeding the reasonable time allowed to investigate the well-being or the identity of the defendant."

The State filed an interlocutory appeal. The Court of Appeals reversed, with Judge, now Chief Judge, Malone concurring and dissenting in part. *State v. Neighbors*, No. 105,588, 2011 WL 5526574 (Kan. App. 2011) (unpublished opinion).

The panel agreed the initial entry into the apartment was permitted under the emergency aid doctrine because Neighbors was unresponsive on the couch. 2011 WL 5526574, at *3. It held Delgado's subsequent entry was also lawful, stating:

"The 911 call indicating a possible burglary or trespass in progress, coupled with [Delgado's] personal knowledge of both Neighbors' and [the other occupant's] criminal histories, established that Officer Delgado had reasonable grounds to believe that there was an emergency at hand and an immediate need for assistance for the protection of property." 2011 WL 5526574, at *4.

The majority then examined whether Delgado's actions once entering were lawful. It characterized Neighbors' argument as suggesting this situation was no different than an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (officer who makes legal stop may conduct protective

frisk of suspect if officer has reasonable suspicion the suspect is armed and dangerous). The panel then noted the United States Supreme Court had only extended the *Terry* analysis to allow a protective sweep inside a dwelling, but it held the *Terry* analysis was nevertheless applicable to determine whether Delgado's pat-down search violated Neighbors' constitutional rights. *Neighbors*, 2011 WL 5526574, at *4-5.

Using that analytical framework, the panel upheld the pat-down search, finding Delgado had a particularized, reasonable suspicion that Neighbors was armed and dangerous. The majority then upheld the consensual pat-down searches of Neighbors' clothing based on its conclusion that Delgado was lawfully present and had reasonable suspicion of wrongdoing based on the totality of the circumstances. 2011 WL 5526574, at *6. Judge Malone agreed Delgado acquired reasonable suspicion of criminal activity to investigate further, but he would have remanded to the district court to make findings as to whether Neighbors' consent was voluntary. 2011 WL 5526574, at *6-7.

Neighbors petitioned for this court's review, which was granted under K.S.A. 20-3018(b) and K.S.A. 60-2101(b).

### ANALYSIS

Under the Fourth Amendment to the United States Constitution, a warrantless entry into a private dwelling by law enforcement officers is considered unreasonable and invalid unless it falls within a recognized exception to the warrant requirement. Kansas courts interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection from unlawful government searches and seizures as the Fourth Amendment.

Kansas recognizes various exceptions permitting warrantless entries or searches: consent; search incident to lawful arrest; stop and frisk; probable cause to search accompanied by exigent circumstances, of which hot pursuit is one example; emergency aid; inventory searches; plain view; and administrative searches of closely regulated businesses. *State v. Mendez*, 275 Kan. 412, 421, 66 P.3d 811 (2003). The principal issue in this case is whether the emergency aid exception applies, but there are aspects of plain view and

consent intermingled with what happened. It is the State's burden to demonstrate that a warrantless entry and the ensuing search and seizure were lawful. See *State v. Carlton*, 297 Kan. 642, 646, 304 P.3d 323 (2013).

*Standard of Review*

The standard of review governing motions to suppress is well established and succinctly stated in *State v. Karson*, 297 Kan. 634, 639, 304 P.3d 317 (2013):

"Our review of an evidence suppression issue is bifurcated. Without reweighing the evidence, the appellate court first examines the district court's findings to determine whether they are supported by substantial competent evidence. [Citation omitted.] The district court's legal conclusions are then reviewed de novo. *If there are no disputed material facts, the issue [of whether to suppress evidence] is a question of law over which the appellate court has unlimited review.* [Citation omitted.]" (Emphasis added.)

But without explanation, the Court of Appeals, after first citing to the correct standard of review, held: "The district court made no factual findings in its order granting the suppression; *therefore, our review is under a de novo standard."* (Emphasis added.) *Neighbors*, 2011 WL 5526574, at *2. The panel does not explain how the absence of factual findings by a district court transforms an appellate court's bifurcated review into de novo review, and this court is aware of no authority to support the panel's standard. Inadequate findings do not necessarily permit de novo appellate review of the facts involved in a warrantless search and seizure. Appellate courts do not reweigh conflicting evidence.

When an appellate court is presented with inadequate findings, the proper course taken depends on whether the issue was raised and can be resolved without remand. See *State v. Raskie*, 293 Kan. 906, 925-26, 269 P.3d 1268 (2012) (remanding because the district court made inadequate findings on defendant's cruel and unusual punishment argument); see also *Drach v. Bruce*, 281 Kan. 1058, 1080, 136 P.3d 390 (2006) (district court presumed to have made all necessary factual findings to support its judgment in the absence of an objection to inadequate findings), *cert. denied* 549 U.S. 1278 (2007).

In this case, Neighbors correctly points out the panel should have remanded if it believed the district court made inadequate factual findings that would have prevented appellate review. We hold the panel erred when it applied a de novo standard of review when faced with what it characterized as inadequate factual findings. Accordingly, we must determine first whether we can proceed. And as discussed below, we hold the district court's findings as reflected in the hearing transcript are sufficient to analyze and decide the controlling legal issue.

*Defining the Emergency Aid Exception*

The State argues that the first four officers lawfully entered the apartment under the emergency aid exception. The panel agreed and held the "initial entry by responding officers is not in dispute." *Neighbors*, 2011 WL 5526574, at \*3. It held further that the record supported application of the emergency doctrine to that initial entry. 2011 WL 5526574, at \*3. Neighbors did not petition for review as to that portion of the analysis, so that much is deemed settled. See Supreme Court Rule 8.03(g)(1) (2013 Kan. Ct. R. Annot. 74); *State v. Allen*, 293 Kan. 793, 795-96, 268 P.3d 1198 (2012) (party must allege issue was erroneously decided to be properly before the Supreme Court on petition for review). Our dispute focuses on the propriety of the officers' actions after their initial entry.

Neighbors argues the emergency attenuated after it was determined Neighbors did not need assistance, so the officers exceeded the permitted scope of their entry into the apartment before Delgado began his narcotics investigation. The State contends the officers were still engaged in a lawful trespass investigation, so Delgado had authority to question Neighbors. The panel took a third approach and effectively applied the emergency doctrine a second time to justify Delgado's separate entry into the apartment. *Neighbors*, 2011 WL 5526574, at \*4 ("[B]ased on what Officer Delgado knew at the time of his warrantless entry into the apartment, the emergency doctrine justified his warrantless entry onto the property."). Both the State and the panel misconstrue how the emergency aid exception operates.

*United States Supreme Court Emergency Aid Exception Cases*

The United States Supreme Court first recognized emergency aid as an exception to the Fourth Amendment's warrant requirement in *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). In *Mincey*, an undercover police officer arranged to buy heroin at an apartment and arrived with nine plain-clothes narcotics officers. The undercover officer slipped in when the apartment door opened, but the occupant attempted to slam the door to keep the other officers out. Those other officers made a warrantless entry, heard a "rapid volley of shots," and saw the undercover officer collapse. He later died.

After the shooting, the officers performed a quick search for additional shooting victims. They found four injured persons and requested emergency assistance. The officers refrained from any further criminal investigation. But within 10 minutes, homicide detectives arrived after hearing a radio report about the shooting. These detectives supervised removal of the suspects and then began an "exhaustive and intrusive" warrantless search of the apartment, which lasted 4 days. 437 U.S. at 388-89.

The *Mincey* Court held: "We do not question the right of police to respond to emergency situations." 437 U.S. at 392. In so ruling, the Court cited numerous state and federal decisions recognizing "the Fourth Amendment does not bar police officers from making warrantless entries and searches *when they reasonably believe that a person within is in need of immediate aid.*" (Emphasis added.) 437 U.S. at 392.

But the *Mincey* Court also cautioned that a warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" 437 U.S. at 393 (quoting *Terry*, 392 U.S. at 25-26). And based on that limitation, the Court refused to apply the emergency aid exception because everyone in the apartment had been located before homicide officers arrived to begin their search. Moreover, the 4-day time span for the ensuing search, which included ripping up carpets, could "hardly be rationalized in terms of the legitimate concerns that justify an emergency search." 437 U.S. at 393. The Court held there were no exigent circumstances

justifying the apartment's warrantless search by the homicide detectives. 437 U.S. at 394.

In its next decision addressing the emergency aid exception, the Court found it applicable. In *Brigham City*, 547 U.S. 398, four police officers responded at 3 a.m. to a call about a loud house party. Upon arrival, officers saw two juveniles drinking beer in the backyard and four adults attempting to restrain another juvenile by pressing him against a refrigerator with enough force that the refrigerator began sliding across the floor. When the juvenile broke free, he punched one of the adults, who had to spit up blood in a nearby sink. The officers announced their presence, but the occupants did not hear them. The officers then made a warrantless entry resulting in an arrest. Defendant sought to suppress all evidence obtained after the officers entered the home, arguing the warrantless entry violated the Fourth Amendment.

The Court upheld the warrantless entry in a unanimous decision, stating: "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." 547 U.S. at 403. Quoting *Mincey*, 437 U.S. at 392, and *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963), the Court held: " ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' " *Brigham City*, 547 U.S. at 403.

The Court also held the officers' subjective intent upon entering the dwelling was irrelevant, noting the Court's long-established rule that "an action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' . . . The officer's subjective motivation is irrelevant. [Citations omitted.]" 547 U.S. at 404-05. The Court held the officers' entry was "plainly reasonable under the circumstances" because they had an objectively reasonable basis for believing the injured adult might need help and that the violence in the kitchen was just the beginning of a larger altercation. 547 U.S. at 406. Finally, the Court concluded the manner of the officers' entry was reasonable because they per-

formed the equivalent to a knock on the screen door, satisfying the knock-and-announce rule. 547 U.S. at 407.

*Mincey* and *Brigham City*, together with *Michigan v. Fisher*, 558 U.S. 45, 47-49, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009), are the only decisions by the United States Supreme Court applying the emergency aid exception. The facts in these cases restrict the exception's application to circumstances when there is an objectively reasonable basis for believing an occupant in a dwelling is "seriously injured or imminently threatened with such injury." 547 U.S. at 400, see *Fisher*, 558 U.S. at 47-49; *Mincey*, 437 U.S. at 392 ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."). This is seen in how the Court articulated the exception and its reliance on the often-quoted rationale advanced by then Circuit Judge Warren E. Burger in *Wayne*, in which he stated:

"[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." 318 F.2d at 212.

One additional case is relevant to understanding the development of the Kansas caselaw discussed next. Almost 20 years before *Brigham City*, the Court decided *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). In that case, an off-duty Chicago policeman was arrested for drunk driving. The officer's car was towed and left outside a nearby garage where the arresting officers conducted a warrantless search of the vehicle because department policy required off-duty personnel to carry a service revolver and they thought a gun might be in the car. The searching officers found evidence linking Cady to a recent homicide. Cady appealed his eventual homicide conviction, arguing the automobile search violated the Fourth Amendment. The Court upheld the search. 413 U.S. at 448.

The *Cady* Court reasoned that officers must "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation,

or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441. It held the search was justified under this caretaking function to protect "the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 U.S. at 447. The *Cady* Court also held the police had a reasonable belief Cady's car contained a gun. 413 U.S. at 448.

But the *Cady* Court took great pains to emphasize the search in that case involved an automobile—not a dwelling. It explained:

> "The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained." 413 U.S. at 447-48.

And consistent with this distinction, several federal Circuit Courts of Appeals have applied a community caretaking exception only to automobile searches. See, *e.g.*, *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) ("We agree with this line of authority holding the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches."); *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir. 1993) ("*Cady* clearly turned on the 'constitutional difference' between searching a house and searching an automobile."); *United States v. Pichany*, 687 F.2d 204, 208-09 (7th Cir. 1982). As discussed below, our caselaw at times has conflated the community caretaking function with the emergency aid exception.

### The Emergency Aid Exception in Kansas

In 1978, as an issue of first impression in Kansas, the Court of Appeals excused a warrantless entry by police responding to an apartment fire, which subsequently led to the seizure of drugs found in plain view during a search for occupants. *State v. Jones*, 2 Kan. App. 2d 38, 41, 573 P.2d 1134 (1978) (*Jones I*). It is significant to note *Jones I* predated *Mincey*.

Although focused on the plain-view exception, the *Jones I* court first had to determine whether the officers had a legitimate prior

justification for the initial intrusion that afforded them their plain view of the incriminating evidence at issue. And in upholding the search, the court observed: "Among the well-established 'legitimate reasons' for a police officer to be present on privately occupied premises is in response to an emergency." 2 Kan. App. 2d at 41 (citing *Wayne; State v. Boyle*, 207 Kan. 833, 839, 486 P.2d 849 [1971]). The *Jones I* court relied in part on then-Judge Burger's statement in *Wayne* that the " 'need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " 2 Kan. App. 2d at 41 (quoting *Wayne*, 318 F.2d at 212).

The *Jones I* court and the federal cases it relied on articulated a limited exception allowing warrantless entry when necessary to provide emergency medical assistance. This exception and its rationale were consistent with the federal and state caselaw at that time. But 19 years later, in another case involving a warrantless entry into an apartment, the justification was expanded by the Court of Appeals to include protection of property. *State v. Jones*, 24 Kan. App. 2d 405, 409-17, 947 P.2d 1030 (1997) (*Jones II*). In *Jones II*, the court adopted a three-part test for the emergency doctrine, offering first a different rationale for the exception, stating:

"The emergency doctrine reflects a recognition that the police perform a community caretaking function which goes beyond fighting crime. [Citation omitted.] *Under this function, the community looks to the police to render aid and assistance to protect lives and property on an emergency basis regardless of whether a crime is involved.* Warrantless entries into and searches of private property pursuant to this exception are not prohibited by the Fourth Amendment to the United States Constitution or by Section 15 of the Kansas Constitution Bill of Rights." (Emphasis added.) 24 Kan. App. 2d at 409-10.

It then adopted its three-part test from *People v. Mitchell*, 39 N.Y.2d 173, 177-78, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976):

" '(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

" '(2) The search must not be primarily motivated by intent to arrest and seize evidence.

" '(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.' " *Jones II*, 24 Kan. App. 2d at 413.

In 2003, this court considered the emergency aid exception for the first time and accepted the three-part test from *Jones II*. See *Mendez*, 275 Kan. at 425-29 (uninvited, nonconsensual entry into private residence when no emergency existed did not justify exception to Fourth Amendment warrant requirement). Thereafter, that test was applied in all subsequent cases until the United States Supreme Court decided *Brigham City*. See *State v. Drennan*, 278 Kan. 704, 720-22, 101 P.3d 1218 (2004) (applying three-part test); *State v. Horn*, 278 Kan. 24, 31-37, 91 P.3d 517 (2004) (applying three-part test).

But this court has not considered the emergency aid exception since *Brigham City v. Stuart*, 547 U.S. 398, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006), although the Court of Appeals has interpreted *Brigham City* to eliminate the test's second prong (search not primarily motivated by intent to arrest and seize evidence). See *State v. Geraghty*, 38 Kan. App. 2d 114, 124, 163 P.3d 350, *rev. denied* 285 Kan. 1175 (2007). Neighbors' case provides us the opportunity to revisit the exception in light of *Brigham City*. And we have determined some modification is necessary.

### *Refinement of the Emergency Aid Exception*

Many jurisdictions followed the *Mitchell* three-part test before *Brigham City* was issued. See, *e.g.*, *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006) (recognizing the Tenth Circuit Court of Appeals followed the three-part test before *Brigham City*). But *Brigham City*, 547 U.S. at 404-05, explicitly overruled the second factor and called into question the exception as articulated under the three-part test. The Kansas Court of Appeals' modification to the test in *Geraghty* was no doubt an attempt to follow this court's precedent to the extent allowed under *Brigham City*, but that revised test continues to be broader than the emergency aid exception recognized by the United States Supreme Court under the Fourth Amendment.

One problem with the current Kansas test, even as modified by the Court of Appeals in *Geraghty*, is that it jumbles the community caretaking function recognized in *Cady* with the emergency aid exception cases. See Shapiro, *The Road to Fourth Amendment Erosion Is Paved with Good Intentions: Examining Why Florida Should Limit the Community Caretaker Exception*, 6 Fla. Int'l. U. L. Rev. 351, 357-60, 361-64 (Spring 2011) (defining community caretaker exception and differentiating it from the emergency aid exception). In other words, emergency aid is a limited exception applicable only when aiding an occupant who is seriously injured or imminently threatened with injury. See *Brigham City*, 547 U.S. at 400, 403. Our statement of the exception needs to be more constrained.

The *Mitchell* three-part test previously followed in Kansas applies the exception to circumstances involving the immediate need for assistance for the protection of life *or property*. But the doctrine's extension to property protection is inconsistent with current federal caselaw and the rationale for the exception. The *Brigham City* Court clearly reflects that the emergency aid exception turns on whether there is "an objectively reasonable basis for believing an occupant is seriously injured or imminently threatened with such injury." 547 U.S. at 400. That statement accurately defines the emergency aid exception to the warrant requirement.

The Tenth Circuit Court of Appeals' current test integrated *Brigham City*'s manner and *Mincey*'s scope requirements into a standard used by that court, which now involves whether "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others; and (2) the manner and scope of the search is reasonable." *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014). But it is not entirely clear why the Tenth Circuit expands the first factor to include officer protection because the caselaw already recognizes a stand-alone officer safety exception. See *State v. Campbell*, 297 Kan. 273, 280, 300 P.3d 72 (2013) ("If an officer can articulate how the presence of a weapon affected the officer's safety, this court has interpreted the Fourth Amendment to allow a warrant-

less entry into a person's home based upon officer safety concerns.").

Accordingly, the emergency aid exception must be seen as a limited exception permitting a warrantless search when: (1) law enforcement officers enter the premises with an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with serious injury; and (2) the manner and scope of any ensuing search once inside the premises is reasonable. Our prior caselaw holding otherwise is overruled.

With the articulation of this revised test for what we now will more accurately term the "emergency aid exception," we consider next its application to the facts in this case.

*Application of the Emergency Aid Exception*

It is undisputed that Officer Doty and the three other responding officers lawfully entered the apartment under the emergency aid exception. Neighbors' concern is that the officers exceeded the exception's scope following their initial entry by remaining in the apartment after Neighbors was awake and his right to be in the apartment confirmed. Using the *Mincey* Court's language, the issue is whether the events occurring after entry were " 'strictly circumscribed by the exigencies which justify its initiation.' " 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]); see also *State v. Walker*, 292 Kan. 1, 13, 251 P.3d 618 (2011) (" 'In other words, we must determine whether running a warrants check [during an investigatory detention] was "reasonably related in scope to the circumstances which justified the interference in the first place." ' "). We hold they were not.

In this case, both lower courts correctly held the emergency aid exception permitted the initial entry. The officers knew an unresponsive male was seen lying on the couch and could not be awakened by yelling or pounding on the front door. This was sufficient to establish an objectively reasonable basis to believe someone inside the apartment could be seriously injured. And while there may have been other concerns related to the landlord's trespass claim, any subjective motivation harbored by the officers prior to their

initial entry regarding a trespass investigation was irrelevant so long as the actions were reasonable when viewed objectively. See *Brigham City*, 547 U.S. at 405; *Arkansas v. Sullivan*, 532 U.S. 769, 771-72, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001) (An objectively reasonable search based on probable cause will not be rendered invalid even when the motive for the search was pretextual.).

Notably, the parties do not focus on whether the responding officers were permitted to begin a trespass investigation once Neighbors was awake and responsive. Instead, their arguments focus on Officer Delgado's actions, which came after the trespass investigation. We consider Delgado's conduct next.

The State relies on *People v. Hochstraser*, 178 Cal. App. 4th 883, 100 Cal. Rptr. 3d 728 (2010), for authority that Delgado's arrival and search was lawful. But that case is inapposite. There, a woman's daughter made a missing persons report and indicated there had been a domestic violence incident the night before. Responding officers went to the woman's apartment, knocked several times, and announced their presence and purpose to no avail. Officers then made a warrantless entry to check on her welfare, which the court upheld under the emergency aid exception. 178 Cal. App. 4th at 899-901. Upon entering, the officers encountered the woman's boyfriend, who stated she had left that morning but he did not know where she was. Officers noticed an open window on a cold, windy night and a " 'chloriney' " smell reminiscent of a cleaned-up crime scene; then in plain view, they observed a spotless bathroom in an otherwise messy apartment; sawzall blades in the kitchen and living room; the victim's personal items such as cell phone, keys, and identification; the boyfriend's spacey demeanor and lack of concern; facial redness and cuts on his face and hands, together with the boyfriend's admission of a domestic violence incident the previous night; and his disregard of a ringing telephone. The officers were suspicious and searched the house and the boyfriend's car. The woman's body parts were in the car.

Charged with her killing, the boyfriend sought to suppress the evidence. The court addressed whether the house or car search impermissibly extended the "justification to render emergency aid to someone inside the home." 178 Cal. App. 4th at 901. The court

ruled it did not. The *Hochstraser* court noted that based on the officers' observations they were justified in continuing their investigation into the woman's whereabouts. 178 Cal. App. 4th at 903. But it upheld the automobile search under the automobile exception, not the emergency aid exception. 178 Cal. App. 4th at 904.

*Hochstraser* is consistent with the line of cases recognizing an officer may continue an emergency investigation until assured there is no one inside in need of assistance—particularly when the officer encounters circumstances that continue to raise suspicions. See 3 LaFave, Search and Seizure § 6.6(a), pp. 620-23 & n.64-65 (5th ed. 2012) (discussing various circumstances and citing numerous cases supporting this proposition). The State's problem is that the officers in Neighbors' case were not continuing an emergency investigation because Neighbors was alert and responsive. In other words, the purpose for their entry—rendering emergency aid—no longer existed. The responding officers had shifted their focus to a trespass investigation, while Delgado, who would arrive on the scene even later, entered the premises to launch his own narcotics investigation.

Neighbors' case is more like the United States Supreme Court's *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), decision in which homicide detectives heard a radio dispatch about a shooting during a narcotics sting operation and reported to the scene 10 minutes later. The homicide detectives then began an extensive warrantless search of the apartment, even though other officers had already identified the apartment's occupants and called for emergency assistance. The *Mincey* Court held the homicide detective improperly exceeded the emergency investigation's scope. 437 U.S. at 393-94.

The emergency aid exception gives an officer limited authority to "do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance." 3 LaFave, Search and Seizure § 6.6(a), p. 622 & n.65. The officer also is limited in the areas of the premises that can be searched. See, *e.g.*, *Najar*, 451 F.3d at 718-20 (holding officers were entitled to search areas where a person needing assistance could be found); *United States v. Russell*, 436 F.3d 1086, 1090-93 (9th Cir. 2006)

(upholding search limited to areas in which a criminal could be hiding or a victim found). And the right of entry dissipates once an officer confirms no one needs assistance or the assistance has been provided. See, *e.g.*, *United States v. Cervantes*, 219 F.3d 882, 891-92 (9th Cir. 2000) (second entry unlawful after fear that methamphetamine lab would explode was dispelled); *United States v. Goldenstein*, 456 F.2d 1006, 1010-11 (8th Cir. 1972) (after realizing no one required aid within hotel room, search of suitcase was illegal).

To be sure, once inside, officers may seize any evidence of a crime in plain view during the course of their legitimate emergency activities. See *Horn*, 278 Kan. at 36 (citing *Mincey*, 437 U.S. at 392-93). But an officer must be lawfully present to invoke the plain-view exception. See *State v. Fisher*, 283 Kan. 272, 293-94, 154 P.3d 455 (2007) (plain view "deals with circumstances in which an officer has already justifiably intruded into a constitutionally protected area and then spots and removes incriminating evidence"). And the object's incriminating character must be immediately apparent without conducting some further search of the object. *State v. Wonders*, 263 Kan. 582, 590, 952 P.2d 1351 (1998); see *Gordon*, 741 F.3d at 71 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 [1993]).

In Neighbors' case, the only evidence arguably in plain view was the Q-Tip, and it is unclear from the record whether it was even confiscated. The only testimony at the suppression hearing was that Delgado observed it, but there was no testimony indicating it was tested for drugs. But even assuming Neighbors' motion to suppress included the Q-Tip, it is questionable whether the seizure could be upheld under the plain-view exception because its incriminating nature was not apparent without conducting some further search of it. More importantly, and as discussed next, Delgado was not lawfully present from the outset, so his discovery of the Q-Tip fell outside the justification for the initial entry.

The only report of an emergency came from the landlord, who informed officers there was an unresponsive male on the couch. In light of that limited emergency, the responding officers impermissibly exceeded the scope of the emergency when they began

investigating the landlord's trespass allegations. And like the homicide detectives' apartment search in *Mincey* and the suitcase search in *Goldenstein*, the trespass investigation was wholly unrelated to the perceived medical emergency. The emergency aid exception could not be invoked as a basis for validating the trespass investigation. The responding officers were required to leave the apartment once it was clear the occupants did not need medical assistance.

The evidence presented at Neighbors' suppression hearing does not establish a firm time line as to when the officers found and were able to speak with the woman located in the back bedroom, so there is some latitude in determining when the cutoff for the emergency aid exception occurred. But the record does establish that officers had already obtained her name and ascertained that she did not need medical assistance before Delgado arrived, so the evidence is at least clear that any concern for rendering emergency assistance had ended. The State cannot rely on any medical emergency to invoke the emergency aid exception to validate Delgado's later entry and ensuing search.

Nor can the search be saved under the notion that the events occurred within a short time period. In *Mincey*, the homicide detectives arrived within 10 minutes and that search was held unlawful because it exceeded the scope of the exigency. 437 U.S. at 393; *cf. State v. Morlock*, 289 Kan. 980, 996, 218 P.3d 801 (2009) ("An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. When the 'responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.' ").

We also cannot accept the panel's rationale—adopted absent argument by the State—that a different emergency triggered the emergency aid, rendering Officer Delgado's entry lawful. The panel surmised that Officer Delgado heard a 911 call indicating a possible "burglary or trespass in progress." *Neighbors*, 2011 WL 5526574, at *4. And that information coupled with his personal knowledge of both Neighbors' and the woman's criminal histories established reasonable grounds to believe there was an emergency

at hand and an immediate need for assistance for the protection of property. 2011 WL 5526574, at *4. But the State has not alleged the officers had probable cause combined with exigent circumstances allowing a warrantless entry, so we do not entertain that possibility.

One additional problem we note with the panel's analysis is that it seems to create an end run around the probable cause requirement by characterizing a criminal investigation itself as an emergency. See 3 LaFave, Search and Seizure § 6.6(b), pp. 623-30 (discussing exigent circumstances allowing warrantless entry on private property to protect property; citing numerous cases). We reject that suggestion. We cannot find any previous Kansas case invoking the emergency aid exception for the protection of property. See *Drennan*, 278 Kan. at 721-22 (welfare check); *Horn*, 278 Kan. at 34-37 (welfare check); *State v. Mendez*, 275 Kan. 412, 413, 66 P.3d 811 (2003) (assisting juvenile); *Jones I*, 2 Kan. App. 2d at 38, 42 (search for occupants in smoke-filled apartment); *State v. Manley*, No. 104,915, 2011 WL 5389881, at *3-6 (Kan. App. 2011) (unpublished opinion) (911 call fearing injured neighbor); see also *State v. Swansen*, No. 100,331, 2009 WL 401007, at *4-7 (Kan. App. 2009) (unpublished opinion) (holding emergency doctrine did not apply to search of methamphetamine lab). And as mentioned earlier, this expansion of the exception would be difficult to reconcile with *Brigham City*.

We hold the emergency aid exception—as articulated in *Brigham City*—does not apply to the protection of property. We hold further that the potential medical emergency that justified the four officers' initial entry into the apartment abated prior to the time Delgado arrived.

Having held the officers' authority to remain in the apartment ended once its occupants were determined not to need emergency assistance, it is unnecessary to address the panel's other holdings that (1) Delgado had reasonable suspicion to believe Neighbors was armed and dangerous; (2) *Terry* applies to pat-down searches inside a home; and (3) Neighbors' consent to search was valid. Finally, the State has not argued the evidence is admissible under the *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed.

2d 677 (1984), good-faith exception to the exclusionary rule, so that argument is waived. See *State v. Hicks*, 282 Kan. 599, 617-18, 147 P.3d 1076 (2006).

The Court of Appeals' judgment reversing the district court is reversed. We affirm the district court's suppression holding.