IN THE COURT OF APPEALS OF THE STATE OF KANSAS

No. 124,970

STATE OF KANSAS,
*Appellee*,

v.

JESSICA MARIE DIXON,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under both the Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights, warrantless searches and seizures by law enforcement officers are deemed unreasonable and invalid unless a recognized exception to the warrant requirement applies.

2.

The emergency aid exception to the warrant requirement applies when (1) law enforcement officers have an objectively reasonable basis to believe someone is seriously injured or imminently threatened with serious injury, and (2) the manner and scope of any ensuing search is reasonable.

3.

A law enforcement officer's limited authority to reasonably determine whether a person needs assistance and to provide such assistance ends when it is no longer reasonable to believe the person needs assistance.

1

4.

The emergency aid exception allows the warrantless search of personal property, such as a purse, when a person is found unconscious or in a semi-conscious condition and the intent of law enforcement's reasonably limited search is to discover the person's identity or other information that may provide medical assistance.

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Oral argument held October 17, 2023. Opinion filed January 26, 2024. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Michael R. Serra*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER and COBLE, JJ.

COBLE, J.: A police officer was getting coffee at a Kwik Shop when a store employee told him a woman was unconscious in the bathroom. Officer Derek Frisby found Jessica Marie Dixon lying on the bathroom floor, conscious but groggy and unresponsive. While waiting for emergency medical personnel and a dispatched officer to arrive, Officer Frisby attempted to identify her and potentially determine if she had ingested a drug, but Dixon remained unable to answer questions. Officer Frisby saw a hypodermic needle, a purse, and a plastic grocery bag on the bathroom floor near Dixon. He searched the purse looking for identification or any drug information that may assist medical personnel treating Dixon. Officer Frisby found Dixon's identification and a sock, which was lumpy to the touch and, according to his training, experience, and knowledge, felt like a smoking pipe. After Dixon was removed from the bathroom by American Medical Response (AMR) but still being treated on-site, Officer Frisby opened the sock and discovered a baggie of crystal methamphetamine and a smoking pipe.

2

Dixon was charged and convicted of one count of possession of methamphetamine and one count of possession of drug paraphernalia. On appeal, Dixon contends the district court erred in finding that the search of her purse was justified by the emergency aid exception to the warrant requirement because any emergency dissipated when AMR arrived to treat her. For the reasons below, we find that the emergency aid exception justified the search and affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2019, Officer Frisby walked into a Kwik Shop for coffee when the store attendant called out to him regarding a "'situation in [the] bathroom.'" At the time, Officer Frisby was unaware the store had also called for emergency services. When Officer Frisby approached the bathroom, he saw a "female laying somewhat on her back up against the wall not talking." Officer Frisby also saw a hypodermic needle on the floor between the female and the bathroom wall, and a purse between the woman and the toilet and sink. No one else was present in the single-toilet restroom.

Officer Frisby entered the bathroom and attended to the woman first. He found her to be semi-conscious and although her eyes were open, she was not responding to his questions in an intelligible manner. While continuing to try to ask the woman to identify herself and what substance she may have taken, Officer Frisby called for AMR, who he knew were at the scene because he had parked behind them in the Kwik Shop parking lot. He called for AMR because he believed the woman may have been experiencing a drug overdose, based on his knowledge, training, and experience. After calling for AMR, Officer Frisby continued his effort to communicate with the woman because he thought if he could identify her, he may be able to give her name to dispatchers so they could run her name through the law enforcement database and find out if she had a history of medical or drug abuse issues. But his pleas to the woman to tell emergency responders what type of drug she ingested were met with largely unintelligible groans. Officer Frisby

3

believed he needed to transfer the medical information to AMR "so they [could] use the proper medication to either bring her back out or keep her from going into a coma or a seizure."

As AMR paramedics and responding police officer, Kain Schappaugh, approached the bathroom, Officer Frisby looked inside the purse laying on the floor to try to find her identification. Officer Frisby carefully went through the purse looking and feeling for a wallet or some form of identification. While still searching the purse for identification, Officer Frisby found a sock inside the purse. He noted it was not common to find a sock in someone's purse but felt for identification potentially inside the sock. Although he did not feel an identification card, he felt an object inside the sock that he recognized as some type of smoking pipe, based on his experience. Having a good idea of what the object in the sock was, Officer Frisby notified AMR they could be dealing with a drug overdose. He continued to look for the woman's identification and eventually found it, identifying her as Dixon, which he relayed to dispatch.

AMR had arrived at the bathroom as Officer Frisby was attending to Dixon, who was still on the floor. Officer Frisby stated that he notified the AMR paramedics of the hypodermic needle but did not give it to AMR or collect it so that the officer assigned to the case could properly handle it. AMR first removed Dixon from the cramped bathroom and assessed her in the main area of the store, then moved her to the parking lot, and eventually transported her to the hospital, although Officer Frisby was unaware to which hospital she was transported.

After finding Dixon's identification card, Officer Frisby handed the card to Officer Schappaugh, and looked inside a plastic grocery bag that was also located near the wall and the toilet. The two officers discussed the need to throw away the grocery bag because it contained food that could not be kept. Officer Frisby, picking up the hypodermic needle from the ground, stated "she shot up something," to the other officer. Officer Frisby then

4

opened the sock, because he believed an illegal substance was present, and found a smoking pipe and some "crystal-type meth crystals" inside in a baggie. Officer Frisby left the drugs and the pipe in the sock inside the purse and handed the entire purse to Officer Schappaugh, who would be assigned to the case, so the contents could be properly inventoried later. Officer Frisby did not take the purse or inventory it for evidence, but provided Officer Schappaugh a detailed narrative of what he did, including what he found in Dixon's purse.

After receiving the narrative from Officer Frisby along with the purse, Officer Schappaugh walked outside the store to the ambulance, still in the parking lot, and gave medical personnel Dixon's identification and notified medical personnel that he believed Dixon had ingested methamphetamine. On review of the two officers' body camera footage, we note the entire incident—from when Officer Frisby entered the bathroom at 11:59 p.m. to the time Officer Schappaugh reported the drug use to the ambulance personnel in the parking lot at 12:06 a.m.—unfolded within about seven minutes.

Dixon was charged with one count of possession of methamphetamine and one count of possession of drug paraphernalia. Dixon asked the district court to suppress what she believed to be illegally seized evidence, arguing that Officer Frisby's search of her purse did not fall under any recognized exception allowing a warrantless search. The State countered that the search was justified under the emergency aid doctrine, citing *State v. Smith*, 59 Kan. App. 2d. 28, 476 P.3d 847 (2020), and in the alternative argued the search fell under the inventory search exception to the warrant requirement. After holding an evidentiary hearing, the district court denied Dixon's motion to suppress. The court found Officer Frisby's search of the purse fell under the emergency aid exception, his discovery of the sock was inadvertent, and the illegal nature of the items were immediately apparent to Officer Frisby. The court determined the search of the purse met the emergency aid exception to the warrant requirement and the discovery of the items inside the sock was permitted by the plain feel exception to the warrant requirement.

5

Dixon later waived her right to a jury trial. Following a bench trial on stipulated facts, the district court found Dixon guilty of possession of methamphetamine and possession of drug paraphernalia. The district court sentenced Dixon to 15 months in prison but suspended the sentence to permit her to serve 18 months' probation, including mandatory drug treatment.

Dixon timely appealed.

## THE DISTRICT COURT DID NOT ERR IN DENYING DIXON'S MOTION TO SUPPRESS EVIDENCE BASED ON THE EMERGENCY AID EXCEPTION

Dixon renews her challenge from her motion to suppress, arguing that despite the application of the emergency aid exception, the window of providing aid extinguishes once assistance is being provided. She contends that a law enforcement officer should not be protected under the guise of emergency aid to justify an unlawful search that extends beyond the appropriate time frame.

*Applicable Legal Principles*

When reviewing a decision on a motion to suppress evidence, "an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo." *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). If the material facts supporting a district court's decision on a motion to suppress are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

Our review of the motion to suppress requires us to examine the warrant requirement included in both the Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights. The Fourth Amendment, made

applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects

> "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .' Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides 'the same protection from unlawful government searches and seizures as the Fourth Amendment.'" *State v. Ellis*, 311 Kan. 925, 929, 469 P.3d 65 (2020).

Under both the federal and state Constitutions, warrantless searches and seizures by law enforcement officers are deemed unreasonable and invalid unless a recognized exception to the warrant requirement applies. *State v. Doelz*, 309 Kan. 133, 140, 432 P.3d 669 (2019). The parties agree the emergency aid doctrine is such a recognized exception.

The emergency aid exception applies when a law enforcement officer is aiding a person who is "seriously injured or imminently threatened with serious injury." *State v. Neighbors*, 299 Kan. 234, 249, 328 P.3d 1081 (2014). In Kansas, our Supreme Court adopted the rationale set forth in *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), to establish the contours of the emergency aid exception in a situation when law enforcement may enter a person's residence without a warrant:

> "[T]he emergency aid exception must be seen as a limited exception permitting a warrantless search when: (1) law enforcement officers enter the premises with an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with serious injury; and (2) the manner and scope of any ensuing search once inside the premises is reasonable." *Neighbors*, 299 Kan. at 249.

The *Neighbors* court explained the emergency aid exception "gives an officer limited authority to 'do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.'" *Neighbors*, 299 Kan. at

7

251. The initial question to analyze whether the emergency aid exception applies is to determine whether law enforcement reasonably believes that a person within the searched area needs immediate aid. *Smith*, 59 Kan. App. 2d at 33-34 (citing *Mincey*, 437 U.S. at 392). Once the officer reasonably believes a person needs immediate aid, the temporary right to a warrantless search terminates "once an officer confirms no one needs assistance or the assistance has been provided." *Neighbors*, 299 Kan. at 252.

The emergency aid exception is most often addressed in cases involving "'trespass investigation[s]'"—that is, when law enforcement enters a residence in response to a possible emergency occurring inside. See, e.g., *Smith*, 59 Kan. App. 2d at 34 (citing *Neighbors*, 299 Kan. at 250-53); *State v. Fisher*, 57 Kan. App. 2d 460, 467-68, 453 P.3d 359 (2019) (officers' warrantless search of the house in response to a possible gunshot victim was lawful under the emergency aid exception); *State v. Jeffery*, 38 Kan. App. 2d 893, 895-96, 173 P.3d 1156 (2008) (holding emergency aid exception did not apply to a police search of Jeffery's entire apartment of items that he might use to harm himself after placing Jeffery in handcuffs); *State v. Davis*, No. 123,747, 2021 WL 5024120, at *8 (Kan. App. 2021) (unpublished opinion) (finding law enforcement officer's warrantless entry into Davis' residence was not justified under the emergency aid exception because the evidence showed the law enforcement officer did not have an objectively reasonable belief that someone inside needed immediate assistance), *rev. denied* 314 Kan. 856 (2022).

But authority on the emergency aid exception as it applies to personal property— as in this case, a purse—is scarce. Other jurisdictions recognize an emergency aid exception supporting the warrantless search of a purse or wallet when the person is found unconscious or in a semi-conscious condition and the intent of the search is to discover the person's identity or other information that may provide medical assistance. See *People v. Wright*, 804 P.2d 866, 869 (Colo. 1991) ("The medical emergency exception will support a warrantless search of a person's purse or wallet when the person is found in

an unconscious or semi-conscious condition and the purpose of the search is to discover evidence of identity and other information that might enhance the prospect of administering appropriate medical assistance to the person."); *Ex Parte Byrd*, No. 1210155, 2022 WL 16847488, at *11-12 (Ala. 2022) (unpublished opinion) (holding that the warrantless search of a pill bottle that ultimately contained marijuana, inside a jacket, searched as the person was being moved by medics, was justified under the emergency aid exception); *United States v. Kempf*, No. 4:18-CR-40067-KES, 2018 WL 6161650, at *7 (D. S.D. 2018) (unpublished opinion) (finding officer's search of a bag was supported by the same emergency aid exception that authorized his presence in the residence of the person in need). Those cases are persuasive, but even more so is an opinion by a panel of our court in *Smith*, recognizing the emergency aid exception excuses a warrantless search of a person's purse or wallet when that person is unconscious and unresponsive. 59 Kan. App. 2d. at 37-38.

In *Smith*, a local paper delivery driver was found unresponsive in her car, parked in a driveway of a residence. Two officers reported to the scene but could not communicate with the female driver or confirm her identity. The officers saw a name, Brittany Smith, on a stack of newspapers in the vehicle and was attempting to verify with dispatch if the name matched the unresponsive woman. But the officers could not verify her identification with certainty. Once the officers removed Smith from the vehicle and emergency medical personnel took over, one of the officers went back to the vehicle to locate her purse. The officer testified the main reason for searching the purse was to look for identification but also to look for any prescriptions to help inform medical personnel about any substance on which Smith may have overdosed. During the search of the purse, the officer found a pipe covered with "'crystal-like residue and burnt residue.'" 59 Kan. App. 2d. at 31.

The district court denied Smith's motion to suppress the evidence acquired from the search of her purse, finding that the search was reasonable in the course of providing

aid in an emergency. 59 Kan. App. 2d. at 32. On appeal, the Court of Appeals panel adopted our Supreme Court's decision in *State v. Evans*, 308 Kan. 1422, 430 P.3d 1 (2018), and held:

> "[Our Supreme Court] recognized that there may be exigent circumstances where an officer may be justified in searching a purse or other personal effect to address an emergency. And Kansas law enforcement officers may search a person's purse or wallet to seek information if that person is unconscious or uncommunicative and there are exigent circumstances, such as a medical emergency, necessitating the search. That is, the emergency-aid exception to the warrant requirement may permit not only a search of a residence but also a search of personal belongings." *Smith*, 59 Kan. App. 2d. at 35.

The *Smith* court ultimately affirmed the district court's decision, recognizing the officer's search of Smith's purse was "reasonably tailored to her attempts to aid emergency medical personnel in rendering appropriate care and treatment to Smith" and was therefore "justified by the emergency-aid exception to the warrant requirement." 59 Kan. App. 2d. at 37-38.

*The District Court Did Not Err in Applying the Emergency Aid Exception and Denying Dixon's Motion to Suppress*

Using these standards, we must determine whether the district court correctly concluded that Officer Frisby's search of Dixon's purse fell under this same emergency aid exception to the warrant requirement. We apply the *Neighbors* test, much as the *Smith* court did, to assess whether Officer Frisby had an objectively reasonable basis to believe Dixon was seriously injured or imminently threatened with serious injury; and, if so, whether the manner and scope of the search of her purse was reasonable. *Smith*, 59 Kan. App. 2d. at 35 (citing *Neighbors*, 299 Kan. at 249; *Wright*, 804 P.2d at 870).

10

First, we examine the facts to determine whether Officer Frisby possessed an objectively reasonable basis to believe Dixon's health was imminently threatened. Here, the facts are analogous to those found in *Smith*—the incident involves an unresponsive person perceived to be suffering a drug overdose. Much like the driver in *Smith*, here Officer Frisby responded to a report of an unidentified, unresponsive person inside a public restroom. He found Dixon groggy, lying on the bathroom floor with a purse and a hypodermic needle nearby, which led him to believe she may have overdosed. Despite the officer's repeated questions, Dixon did not communicate with him, so he could not identify her or determine what substance she potentially ingested simply from seeing the hypodermic needle. Even after the second officer and AMR personnel arrived, Dixon remained incoherent and although she was semi-conscious, she was unable to respond to questions regarding her identity or condition. The exigency of the situation is evident in the short time span—just seven minutes—during which the entire incident played out. Given these circumstances, Officer Frisby's assessment that Dixon was seriously injured or her health was imminently threatened because of an overdose was objectively reasonable. See *Smith*, 59 Kan. App. 2d. at 36 (citing *State v. McKenna*, 57 Kan. App. 2d 731, 737-40, 459 P.3d 1274, *rev. denied* 312 Kan. 898 [2020]).

Having found Officer Frisby's belief that Dixon was in immediate danger to be reasonable, we must then determine whether the manner and scope of his search of her purse was reasonable. *Smith*, 59 Kan. App. 2d. at 35 (citing *Neighbors*, 299 Kan. at 249; *Wright*, 804 P.2d at 870). Officer Frisby acted immediately to aid Dixon, not only attempting to communicate with her, but promptly calling for medical assistance. While waiting for medical assistance to arrive and while AMR assessed Dixon, he searched her purse for identification and any other information that could aid medical personnel.

Dixon contends that Officer Frisby's "search was not to find the cause of the medical emergency," because the cause of the medical emergency was "laying on the ground next to her in plain view"—the used hypodermic needle. Dixon also argues her

11

identification was unnecessary to render medical assistance, and in fact medical professionals had arrived and were taking over her care without it. For these reasons, she believes Officer Frisby's search of her purse exceeded the scope allowed by the emergency aid exception to the warrant requirement.

But we disagree that the law requires us to parse this short incident into simply "before AMR arrived" and "after AMR arrived" to determine when the emergency aid exception is legitimate. It is true that an officer on scene has the authority to do no more than is reasonably necessary to aid in an emergency. *Neighbors*, 299 Kan. at 251. And, that warrantless search authority ceases when officers determine the need to render emergency aid no longer exists. 299 Kan. at 252. But does this demand a bright-line rule that once medical responders are on scene, law enforcement is no longer expected to be a part of that emergency aid?

We do not think so. Such a bright-line ruling would directly conflict with the public policy behind the emergency aid exception, which is that at times, the need to protect or preserve life is paramount to the right to privacy. *Smith*, 59 Kan. App. 2d at 37. Before and after the arrival of AMR, Officer Frisby continued to aid in Dixon's treatment. His intent in searching her purse was to use any information gained to notify AMR personnel—still on site—so they could properly treat Dixon and hopefully prevent her condition from deteriorating into seizures or a coma. When he felt the pipe inside the sock—recognizing it as a smoking pipe, given his years in law enforcement and his knowledge, training, and experience—Officer Frisby did not immediately open the sock but continued to search for identification, which was his initial concern. When the officer found her identification, he communicated with dispatch to determine whether Dixon had any known medical conditions or history of drug abuse. Notably, Officer Frisby did not ask dispatch to check Dixon's legal history or active warrants—he solely utilized Dixon's identification for medical aid purposes.

12

Officer Frisby recognized that the hypodermic needle indicated Dixon had injected some type of drug, but when he asked her to identify the drug she had ingested, she was uncommunicative. During the entirety of Officer Frisby's search, Dixon was semi-conscious yet incoherent and unable to effectively communicate with AMR or the officers on scene. So, after finding Dixon's identification, Officer Frisby then opened the sock, anticipating finding drug paraphernalia which would provide him another clue as to what drug Dixon had taken. Given his training and experience, the officer recognized the pipe and the baggie inside the sock as methamphetamine, and relayed both her identity and the drug information to Officer Schappaugh. The second officer then went directly to the ambulance, still on scene in the parking lot attending to Dixon, to relay the same to medical personnel. As paramedics were attending to Dixon, law enforcement supported their efforts. In this way, medical personnel and law enforcement were working in tandem to ascertain the most information possible to aid in Dixon's treatment. The manner in which Officer Frisby conducted the search of Dixon's purse was reasonable.

And the scope of the search was also reasonable. As already mentioned, the entire incident—from Officer Frisby's discovery of Dixon through Officer Schappaugh telling AMR about Dixon's identity and suspected methamphetamine ingestion—occurred over a seven-minute span. The search of Dixon's purse was but a small part of the incident. This was not a situation where the officers first sought medical care for Dixon, she then left the scene with medical personnel, and officers returned to the scene to investigate. See *Smith*, 59 Kan. App. 2d. at 30-31 (where officers found a pipe with methamphetamine residue in Smith's purse while she was being assisted by paramedics, then after Smith was already en route to the hospital, officers began searching Smith's car; the court suppressed evidence seized from the car). Officer Frisby's search ended when he ascertained Dixon's identification and ingested drug and passed it to Officer Schappaugh, who provided the information to AMR before the ambulance left the Kwik Shop.

13

In sum, we find both the manner and scope of Officer Frisby's search was reasonably executed to render emergency aid by obtaining information for the medical personnel on scene to effectively treat Dixon's urgent condition. The district court, relying on this court's holding in *Smith*, did not err in concluding that Officer Frisby's search of Dixon's purse was reasonable and lawful.

Finally, we briefly address Dixon's claim related to the plain feel doctrine—that because any emergency dissipated when AMR arrived, Officer Frisby's search of the purse was unlawful at its inception, so the plain feel doctrine could not apply to his recognition of the pipe inside the sock. The district court did find that Officer Frisby's initial intrusion into the purse was lawful, the incriminating nature of the items inside the sock was immediately apparent to him, and so the plain feel exception applied to the search of the sock. But Dixon fails to develop her challenge to the district court's ruling on the plain feel exception any further on appeal than her single statement. Because we have found Officer Frisby's search of Dixon's purse to be lawful, we agree with the district court that the plain feel exception would be applicable to the officer's additional search of the sock. See *Neighbors*, 299 Kan. at 252 (finding once law enforcement lawfully enters a constitutionally protected area, "officers may seize any evidence of a crime in plain view during the course of their legitimate emergency activities"); *State v. Wonders,* 263 Kan. 582, 598, 952 P.2d 1351 (1998) (adopting the plain feel exception and finding for an object's character to be immediately apparent in the plain feel context, an officer "need only have had reasonable or probable cause to believe it was immediately apparent" that the item felt during a lawful search was contraband). But because Dixon raises the plain feel issue only incidentally, we need not address it further, because her argument is waived. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) ("A point raised incidentally in a brief but not argued is also deemed abandoned.").

Based on the reasons above, Officer Frisby's warrantless search of Dixon's purse was intended to provide emergency aid by providing medical personnel information to properly render treatment to Dixon. Officer Frisby had an objectively reasonable belief that Dixon needed emergency assistance and the manner and scope of his search was objectively reasonable. Thus, the search was justified under the emergency aid exception and the district court did not err by denying Dixon's motion to suppress evidence.

Affirmed.